14153-35
JLB

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILMER CATALAN-RAMIREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-03258 |
| | ) | |
| RICARDO WONG, Field Office Director, | ) | The Hon. Joan H. Lefkow |
| Chicago, U.S. Immigration and Customs | ) | Magistrate Judge Jeffrey Cole |
| Enforcement ("ICE"); ICE AGENT JOHN | ) | |
| DOES 1-6; MCHENRY COUNTY, | ) | |
| MCHENRY COUNTY SHERIFF BILL PRIM, | ) | |
| CHIEF OF CORRECTIONS DAVID | ) | |
| DEVANE, CORRECT CARE SOLUTIONS, | ) | |
| HEALTH ADMINISTRATOR MIKE | ) | |
| KEEGAN, SUPERINTENDENT EDDIE | ) | |
| JOHNSON, COMMANDER CHRISTOPHER | ) | |
| KENNEDY, COMMANDER ALFRED | ) | |
| NAGODE, CHICAGO POLICE OFFICER | ) | |
| JOHN DOES 1-2, and CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

**RESPONSE OF CORRECT CARE SOLUTIONS, LLC, AND MICHAEL KEEGAN, R.N. TO MOTION FOR PRELIMINARY INJUNCTION**

NOW COME Defendants, CORRECT CARE SOLUTIONS, LLC, and MICHAEL KEEGAN, R.N., by their attorneys, HEYL, ROYSTER, VOELKER & ALLEN, and for their Response to Plaintiff's Motion for Preliminary Injunction, state:

*Introduction*

Since Plaintiff Wilmer Catalan-Ramirez's detention at the McHenry County Adult Detention Facility ("the jail") on March 27, 2017, he has received, and continues to receive, ample and appropriate care for various conditions sustained prior to his detention at the jail, including

1

14153-35
JLB

a sore shoulder, traumatic brain injury and gunshot wounds. Curiously missing from Plaintiff's motion for a preliminary injunction is any mention by Plaintiff's attorneys of this extensive medical treatment, despite their awareness of it. This extensive treatment includes the following:

(1) By the time of the May 9, 2017 hearing, Plaintiff will have been seen by a team of specialists including an orthopedic surgeon (Dr. Dana Tarandy), a neurologist (Dr. Nager), an orthotic doctor (Mercy Rehabilitation, Orthotics, Prosthetics Center), a physical therapist (same), an occupational therapist (same), a psychiatrist (Dr. Hargurmukh Singh) and an optometrist (Dr. Roger D. Roberts, OD). Updated records will be brought to Court on May 9th.

(2) A CT scan of Plaintiff's left shoulder was obtained and has revealed no acute fracture.

(3) Plaintiff has had at least four visits with Young Kim, M.D., and has also had multiple contacts with the nursing and mental health staff at the jail.

(4) Plaintiff was ordered taken to the emergency room at the hospital for complaints of chest pain, which was determined by the emergency room physician not to require further treatment.

(5) Plaintiff has received special medical orders from Dr. Kim for a low bunk, an extra mattress, a lower extremity brace, a sling, and his own gym shoes (if approved by security).

(6) Plaintiff has received various pain medications and muscle relaxants, including Baclofen, Tramadol and Naprosyn, and is also taking Remeron. On April 22, 2017, Plaintiff asked, in writing, to be taken off of his pain medications.

See Declaration of Young Kim, M.D., attached hereto as Exhibit A, para. 9; Plaintiff's medical treatment records, attached hereto as Exhibit A2 (Bates Stamp Nos. HRVA 1-198 and 225-227).

2

14153-35
JLB

This is not a case in which court-ordered medical treatment is necessary or warranted, and Plaintiff's claim that the medical treatment provided to him has been something other than appropriate and timely is both inaccurate and lacking in good faith. Further, to the extent that there has been any delay in treating the conditions about which Plaintiff now complains, that delay was the result of the failure by Plaintiff to provide complete information to his medical providers regarding his condition and his prior treatment in a timely manner.

*Facts*

Medical Services at the McHenry County Adult Detention Facility

Young Kim, M.D., provides medical services to detainees at the jail. *See* Exhibit A, paras. 1-2. Michael Keegan, R.N., is employed by Correct Care Solutions, LLC, to serve as the Health Services Administrator at the jail. Mr. Keegan's duties in that position are administrative. He manages the medical staff at the jail. He generally does not provide direct patient care and did not personally provide health care to Plaintiff. *See* Exhibit A, para. 3.

In addition to housing inmates awaiting trial on state criminal charges, the jail houses U.S. Immigration and Customs Enforcement detainees pursuant to an agreement that the jail has with the federal government. Pursuant to that agreement, all off-site medical care must be approved by the federal government. Dr. Kim recommends off-site medical care if he deems it to be medically necessary. *See* Exhibit A, para. 4; Exhibit A1.

There is a healthcare unit at the jail. Medical care is available to detainees at the jail 24 hours a day, 7 days a week. For nonemergency care, detainees may submit a sick call request on electronic kiosks in the housing units. The nursing staff at the jail triages the requests and places individuals on a list to be seen by Dr. Kim or a mental health professional, depending upon the patient's needs. For emergency care, detainees may advise correctional staff of the emergency.

3

Correctional staff will notify the on-duty medical staff and transfer detainees to the emergency room if indicated. Detainees may also submit grievances concerning their medical care through the electronic kiosks pursuant to the jail's grievance procedure. *See* Exhibit A, para. 5.

Neither CCS nor the medical and other health care staff at the jail controls when a patient is seen by off-site specialists for nonemergency care, as the care must first be approved by the federal government, arrangements must be made for security during the visit to the specialist's office, and the appointment must coincide with the off-site specialist's schedule. *See* Exhibit A, para. 6.

<u>Plaintiff's Treatment Since March 27, 2017</u>

Plaintiff Wilmer Catalan-Ramirez has been a detainee at the jail since March 27, 2017. *See* Exhibit A, para. 7. He presented to the jail after being released from Loyola Medical Center, where he was treated for an injury to his left shoulder. *See* Exhibit A, para. 10. Plaintiff was initially assessed by Crystal Keener, LPN, on March 28, 2017 due to his left shoulder injury. Dr. Kim gave a verbal order to continue Plaintiff on tramadol, which had been prescribed to Plaintiff at the hospital. Dr. Kim also prescribed baclofen, which is a muscle relaxant, and provided Plaintiff with a low bunk restriction. Plaintiff was also placed on Dr. Kim's list to be seen on March 29, 2017. *See* Exhibit A, para. 11.

Dr. Kim first evaluated Plaintiff on March 29, 2017. Plaintiff reported only that he was in an altercation with police during his arrest and injured his left shoulder without mentioning any alleged ongoing treatment or therapy for any conditions. Dr. Kim entered orders for Plaintiff's continued use of a left arm sling, for continuation of tramadol, baclofen and Naprosyn, and for a lower bunk. Dr. Kim also referred Plaintiff to see an off-site orthopedic surgeon for evaluation and consultation. Plaintiff did not report to Dr. Kim, or complain of, a traumatic brain injury, a

4

14153-35
JLB

need for a lower extremity brace, gunshot wounds, or any problems with ambulation or activities of daily living. *See* Exhibit A, para. 12.

On April 5, 2017, Plaintiff was seen for a consultation concerning his shoulder injury by off-site orthopedic surgeon Dr. Dana Tarandy, who is with Mercy Woodstock Medical Center in Woodstock, Illinois. X-rays were taken, and Dr. Tarandy also recommended an MRI of Plaintiff's shoulder. *See* Exhibit A, para. 13. Dr. Kim saw Plaintiff on April 5, 2017 following his visit with Dr. Tarandy to discuss Dr. Tarandy's recommendation for an MRI. Plaintiff informed Dr. Kim for the first time during this visit that he had bullets in his chest, right shoulder area and brain, rendering an MRI potentially hazardous in light of the magnetic technology utilized in the diagnostic test. Dr. Tarandy's office was called about the situation that same day. The jail received orders from Dr. Tarandy on April 20, 2017 for an arthrogram and CT scan of the shoulder without contrast as a safe alternative. Dr. Kim also ordered Naprosyn for Plaintiff. On May 2, 2017, Dr. Kim received the report concerning the CT of Plaintiff's shoulder, which was performed on May 1, 2017. There was minimal narrowing of the AC joint but no acute fracture was noted. *See* Exhibit A, para. 14. A follow-up appointment has been set with Dr. Tarandy.

On April 6, 2017, Ruth Dembinski, R.N., performed a medical history and physical assessment on Plaintiff at the jail. Plaintiff's left arm was in a sling at that time. Plaintiff also reported that he had been shot six times and complained of having a history of occasional difficulty swallowing, of having headaches, and of balance issues. His mood was noted to be appropriate and without depression. No mental health problems were noted. Ms. Dembinski entered a note on April 26, 2017 indicating that, at the time of this history and physical, Plaintiff had no visible difficulty with ambulation or alteration of his normal gait. He walked into and out of the exam room unassisted and without complaints. *See* Exhibit A, para. 15.

5

14153-35
JLB

On April 6, 2017, Plaintiff submitted a sick call request stating that the Velcro strap on his left lower extremity brace was broken. This was the first time Plaintiff mentioned the need for a leg brace to medical staff. He was seen in sick call by Deene Hawkinson, L.P.N., on April 27, 2017. The nurse on April 7, 2017 had Plaintiff sign a release of information ("ROI") for medical records from Mt. Sinai Hospital which were expected to provide information regarding the reason for his leg brace. *See* Exhibit A, para. 16.

On April 7, 2017, the jail received Plaintiff's records from Schwab Rehabilitation Hospital. The records reflect that Plaintiff was admitted to the hospital on January 23, 2017 for treatment of multiple gunshot wounds, a traumatic brain injury and left hemiplegia. Neurosurgery was consulted at the hospital concerning the remaining bullets, but the neurosurgeon determined no acute surgical intervention was needed. Plaintiff was discharged from the hospital on February 11, 2017. By the time of his discharge, Plaintiff was noted to be able to eat, groom and walk independently. He was also able to demonstrate executive functioning skills for moderately complex tasks. *See* Exhibit A, para. 17.

The medical staff at the jail requested any outpatient rehabilitation, therapy and medical treatment records concerning Plaintiff from the time of his discharge on February 11, 2017 to the time of his detention on March 27, 2017 for continuity of care purposes, but no records had been received by the time Plaintiff filed his motion for a preliminary injunction. *See* Exhibit A, paras. 17 and 29. On April 26, 2017, Plaintiff's counsel sent defense counsel a "To Whom it May Concern," one-paragraph letter dated April 6, 2017 from a doctor at Schwab Rehabilitation Hospital vaguely stating that Plaintiff needed therapy. The letter does not prescribe or articulate any specific exercises for Plaintiff to perform, rendering it unhelpful in providing any guidance regarding Plaintiff's treatment needs, especially considering that Plaintiff was already scheduled

6

14153-35
JLB

for both physical therapy and occupational therapy evaluations at the time the letter was provided. Those evaluations will be complete by the time of the May 9, 2017 hearing, and the therapists' recommendations will be incorporated into Plaintiff's treatment plan. *See* Exhibit A, para. 36.

Defense counsel finally received the outpatient rehab records from Plaintiff's counsel for the first time on May 5, 2017 –after the motion for an injunction had been filed, after physical therapy and occupational therapy evaluations had been set for Plaintiff and just shy of the evidentiary hearing. Those records are inconsistent with Plaintiff's allegations that he requires therapy three days a week, including speech therapy, and medications. Indeed, from Plaintiff's discharge from the hospital on 2/11/17 to his intake at the jail on 3/27/17, Plaintiff only underwent therapy four (4) times on 3/10/17, 3/17/17, 3/22/17 and 3/24/17, and he was not taking any medications. Plaintiff was evaluated for speech therapy and it was determined by the therapist that he does not need it. *See* Exhibit C, attached hereto as HRVA 465-499, 528-529.

Dr. Kim saw Plaintiff on April 12, 2017. He noted that Plaintiff had been seen by Dr. Tarandy for his left shoulder injury and that Dr. Tarandy's recommendation for an MRI was complicated by Plaintiff's report that he had bullets in his chest, right shoulder and brain, which was confirmed by records received from the hospital. Dr. Kim was waiting for Dr. Tarandy's recommendations concerning surgical interventions and for Dr. Tandy's views on physical therapy. Plaintiff at that time denied any vision loss but complained of occasional headaches and blurry vision in his left eye. His visual acuity was 20/20 in both eyes on exam. Dr. Kim referred Plaintiff to an optometrist for an evaluation, which was conducted on April 25, 2017. Dr. Kim ordered that arrangements be made so that Plaintiff's brace could be repaired. In the meantime, Dr. Kim ordered that a band be placed to secure his brace daily. Dr. Kim also entered

7

14153-35
JLB

an order allowing Plaintiff to have access to his own shoes from his property if approved by jail security. Dr. Kim continued Plaintiff's pain medications (tramadol, Tylenol and Naprosyn), and ordered a follow-up appointment for Dr. Kim. *See* Exhibit A, para. 19.

On April 16, 2017, Plaintiff submitted a request to wear his regular gym shoes that were placed in his property by corrections staff. He had a brace on his left foot. Dr. Kim approved this request. *See* Exhibit A, para. 20. Plaintiff made a sick call request to see a mental health provider on April 16, 2017 for depression, anxiety and problems with sleeping. That request was received by health care staff at the jail on April 17, 2017, and Plaintiff was seen by the mental health supervisor, Mary Pawelko, MHP, on April 18, 2017, who scheduled Plaintiff to see the psychiatrist on April 21, 2017. *See* Exhibit A, para. 21. On April 17, 2017, Plaintiff made a sick call request asking for a second mattress. Dr. Kim approved the request. *See* Exhibit A, para. 22. On April 20, 2017, Dr. Kim entered orders referring Plaintiff off-site to see a neurosurgeon for follow-up on the traumatic brain injury for which he was treated after his gunshot wounds, for physical therapy and occupational therapy evaluations, and for further therapy needs. Mr. Keegan noted the referrals on April 21, 2017 as well as the referral to orthotics for evaluation of his leg brace for repair or replacement. *See* Exhibit A, para. 23. On April 22, 2017, Plaintiff submitted a sick call request asking for his regular gym shoes, despite the fact that Dr. Kim had previously approved this request. Jail security staff needed to approve Plaintiff's use of his shoes at that point. *See* Exhibit A, para. 24.

Plaintiff submitted a sick call request on April 22, 2017, stating that he no longer wanted to take pain medication, and requesting surgery for the removal of the bullets. Although the neurosurgeon who treated Plaintiff at the hospital following his injuries had already given the opinion that surgery was not recommended, Dr. Kim referred Plaintiff to a neurologist for

8

14153-35
JLB

consultation regarding Plaintiff's request for surgery. This consultation will have taken place by the time of the hearing on May 9, 2017. *See* Exhibit A, para. 25.

On April 24, 2017, Plaintiff submitted a sick call request for assistance with sleep. Maryann Pawelko, MHP, responded by stating that Plaintiff was scheduled to see the psychiatrist, but that Plaintiff was out of the facility at the time of his appointment, so the appointment was reset for April 27, 2017. *See* Exhibit A, para. 26. On April 20, 2017, Plaintiff's attorneys sent a letter to various entities raising issues about Plaintiff's treatment at the jail that had not been raised by Plaintiff with medical staff previously, such as Plaintiff's alleged inability to perform activities of daily living. Plaintiff had not previously made those complaints known to Dr. Kim or to other health care staff at the jail, nor had Plaintiff submitted any grievances at the jail which would have allowed the jail and medical staff to attempt to resolve the issues at the institutional level and without litigation. At that point, staff began observing Plaintiff to assess the allegations being made regarding Plaintiff's condition. Plaintiff has been observed by several medical staff members performing his activities of daily living reasonably well and without assistance. *See* Exhibit A, paras. 27-28, 32-34.

On April 26, 2017, Plaintiff was sent to Centegra Hospital following complaints of chest pain. He was diagnosed with chest wall pain and discharged in stable condition with Naprosyn, magnesium oxide and cyclobenzaprine, which Dr. Kim approved. *See* Exhibit A, para. 30. Dr. Kim saw Plaintiff again on April 26, 2017 after he returned from the hospital. D. Kim reviewed the paperwork from the hospital, which revealed that the hospital's workup was unremarkable and that Plaintiff was diagnosed with chest wall pain due to strain of the chest muscles. He was without chest pain and did not have any shortness of breath when Dr. Kim saw him. Plaintiff requested surgery to remove his bullets and also asked for assistance with daily dressing

9

14153-35
JLB

changes. Dr. Kim conducted a physical examination which was unchanged from the week before. Dr. Kim was waiting for the CT scan of Plaintiff's shoulder (which has since been received) and recommendations from the orthopedic surgeon. Dr. Kim's plan was to consult with the neurosurgeon about possible removal of the bullets. Dr. Kim was also waiting for the occupational therapy and physical therapy evaluations to be performed. All of the specialty referrals are scheduled to take place by May 9, 2017. Dr. Kim reiterated his prior orders that the brace should be fixed if it had not been fixed already, that Plaintiff was to have access to his gym shoes, that he may have an extra mattress, and that he was to continue with his pain medications. Dr. Kim also contacted ICE for a possible transfer to a facility which can provide special accommodations for Plaintiff, such as to assist with daily clothing changes if such is necessary. Plaintiff is to follow up with Dr. Kim after each consultation. *See* Exhibit A, para. 31.

<u>Medical Opinions</u>

While Plaintiff has attached to his motion a statement by a hospitalist, Dr. Schwartz, concerning what care she feels Plaintiff should be receiving, Dr. Schwartz has never examined Plaintiff and does not appear to have an accurate, complete or up-to-date set of Plaintiff's medical treatment records. Dr. Schwartz suggests that Plaintiff has not been seen by any specialists since his intake on March 27, 2017. This is false. Plaintiff was seen by an orthopedic surgeon (Dr. Tarandy) as early as April 5, 2017, making it unclear what set of records Dr. Schwartz was given. Plaintiff has also been seen by an optometrist (Dr. Roberts) and by a psychiatrist (Dr. Singh), and, by the time of the May 9, 2017 hearing, Plaintiff will also have been seen by a neurologist (Dr. Nager), an orthotic doctor (Mercy Rehabilitation, Orthotics, Prosthetics Center), a physical therapist (same) and an occupational therapist (same). A CT scan of Plaintiff's shoulder was also performed which revealed no acute fracture of Plaintiff's left

10

14153-35
JLB

shoulder. Defense counsel has requested the three exhibits referenced in Dr. Schwartz's statement so that counsel may assess the basis for Dr. Schwartz's opinions, and Plaintiff's counsel has not yet provided them to her. Plaintiff's counsel does, on the other hand, have up-to-date records relating to Plaintiff's treatment at the jail: defense counsel has been sending updated records to Plaintiff's attorney since receiving her April 20, 2017 letter. It is unclear why Plaintiff's counsel would not send these records to Dr. Schwartz considering the magnitude of Plaintiff's request in this case for extraordinary relief.

In contrast, Dr. Kim has examined Plaintiff multiple times. He has approved all of Plaintiff's requests and has coordinated a team of specialists to evaluate and treat Plaintiff. It is Dr. Kim's opinion, to a reasonable degree of medical certainty, based upon his education, training, experience, interactions with Plaintiff and review of the records, that the applicable standard of care is being met in terms of Plaintiff's treatment at the jail and that he has received, is receiving, or is scheduled to receive all medically necessary care. *See* Exhibit A, paras. 35-36.

Dr. Kim holds the opinion that there is no emergency in terms of Plaintiff's medical condition. There is no evidence of any permanent damage or substantial harm or deterioration in Plaintiff's condition since being detained on March 27, 2017. He appears in all respects to be doing reasonably well. *See* Exhibit A, para. 37. It is also Dr. Kim's opinion to a reasonable degree of medical certainty, based upon his education, training, experience, interactions with Plaintiff and review of Plaintiff's records, that Plaintiff will not suffer any injury or damage by waiting for all scheduled specialty consultations to take place by May 9, 2017, including, but not limited to, neurosurgery, orthopedic surgery, physical therapy, occupational therapy and orthotics. *See* Exhibit A, para. 38. At no time has Dr. Kim harassed or retaliated against Plaintiff in any respect

11

14153-35
JLB

during his detention at the jail, nor has anyone else. *See* Exhibit A, para. 39. The aforementioned extensive treatment is wholly inconsistent with Plaintiff's allegations.

### *Standard of Review*

A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997). To justify a preliminary injunction, the plaintiff must show that he is likely to succeed on the merits, that he is likely to suffer irreparable harm without the injunction, that the harm he would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and that the injunction is in the public interest. These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted. *Judge v. Quinn*, 612 F.3d 537, 546, 2010 U.S. App. LEXIS 12353, *18, 68 A.L.R.6th 765 (7th Cir. Ill. 2010). Mandatory preliminary injunctions which require the defendant to take some affirmative action, such as the injunction sought in the instant matter, represent an even more extraordinary remedy. *Harlem Algonquin LLC v. Canadian Funding Corp.*, 742 F.Supp.2d 957, 960 (N.D. Ill. 2010). As mandatory injunctions require the Court to command the defendants to take a particular action, they are "cautiously viewed and sparingly issued," such that only "the clearest equitable grounds" will satisfy the remedy. *Id*. More than speculation of irreparable harm is necessary to warrant issuing a preliminary injunction. *Matta-Ballesteros, ex rel. Stolar v. Henman*, 697 F.Supp. 1036, 1038 (S.D.Ill. 1988). Obtaining a temporary restraining order requires the movant to satisfy an even higher standard, by showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A); LR 77.2.

14153-35
JLB

>   Additionally, Section 3626(a)(2) of the Prison Litigation Reform Act provides:
>
>   (2) Preliminary injunctive relief.— In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

18 U.S.C. Section 3626(a)(2). *See also Westefer v. Neal*, 682 F.3d 679, 681, 2012 U.S. App. LEXIS 11386, *1, 2012 WL 2017967 (7th Cir. Ill. 2012) (the appellate court agreed with prison officials that the district court's injunction exceeded what was required to remedy the due-process violation, contrary to the terms of the PLRA, and to cautionary language from the U.S. Supreme Court about remedial flexibility and deference to prison administrators).

### *Argument*

Plaintiff has first failed to sustain his burden of showing a likelihood of success on the merits. Plaintiff only asserts Section 1983 *Monell* claims against CCS and Nurse Keegan (official capacity only), though he ignores the pleading and proof requirements in both his Complaint and his motion. Defendants incorporate herein by reference their Motion to Sever and Transfer Misjoined Claims/Parties to Western Division and/or Motion to Dismiss. *See* Court Doc. No. 25. Plaintiff has not alleged any facts from which the Court could reasonably infer that an unconstitutional policy on the part of CCS has caused, or will cause, any damages or injury to Plaintiff or that Mr. Keegan made any decisions that resulted in Plaintiff's rights being violated. Mr. Keegan is an administrator who does not provide direct-patient care. He has not provided

13

14153-35
JLB

care to Plaintiff and does not make medical decisions in terms of diagnoses or treatment plans. There are no medical providers sued in their individual capacities. Even if the Court were to consider the medical deliberate indifference standard discussed by Plaintiff in his motion, Plaintiff still would be unable to prevail on the merits in light of the fact that all of Plaintiff's requests for accommodations have been approved by Dr. Kim and that Plaintiff has been referred out to an orthopedic surgeon, a neurologist, a physical therapist, an occupational therapist, an optometrist, a psychiatrist, to the emergency room and to have a CT scan performed. There is no need for Court intervention.

Furthermore, there is no reliable evidence that Plaintiff will suffer harm if this Court refrains from entering an injunction. Dr. Kim, who has evaluated Plaintiff multiple times, is of the opinion that there is no such risk of harm. By the time of the 5/9/17 hearing, Plaintiff will have already undergone comprehensive evaluations by a team of specialists, and will have a plan of care that incorporates the therapists' recommendations. None of the cases cited by Plaintiff involve a similar set of facts where the plaintiff was already receiving extensive care as Plaintiff is here. While Dr. Schwartz concludes in her statement that Plaintiff will be harmed without vague treatment, her comments are misplaced as she seemingly is not aware of the treatment being provided to Plaintiff. In regard to medications, Plaintiff was prescribed several medications but he specifically asked to be taken off of pain medications on April 22, 2017. *See* Exhibit A2, HRVA 117. *See also* Medication Administration Records, Exhibit A2, HRVA 99-107. It is also unclear why Plaintiff's counsel is asking the Court to enter an order forcing Defendants to administer medications to Plaintiff that he does not wish to take. Also, Plaintiff's records show he was not taking any medications before his intake at the jail on 3/27/17. *See* Exhibit C.

14

14153-35
JLB

In sum, the order that Plaintiff requests the Court to enter entirely ignores the care that has already been, and continues to be, provided to Plaintiff. Injunctive relief is not appropriate where Plaintiff is being provided with adequate care, and would be wholly inconsistent with Section 3626(a)(2) of the Prison Litigation Reform Act, which dictates that principles of comity be respected and that injunctive relief only be granted to the extent it is necessary. It is not necessary here. *See Banks v. Rios*, 2011 U.S. Dist. LEXIS 5993 (C.D. Ill. 2011) (denying request for injunction where care was being provided for potential loss of sight) (Exhibit B); *Young v. Ballis*, 762 F. Supp. 823 (1990) (denying injunction where no immediate threat existed).

WHEREFORE, Defendants, CORRECT CARE SOLUTIONS, LLC, and MICHAEL KEEGAN, R.N., pray for an Order denying Plaintiff's Motion for Preliminary Injunction, severing Counts III to V of Plaintiff's Complaint, transferring Counts III to V to the Northern District of Illinois, Western Division, dismisses Count III and V as against CORRECT CARE SOLUTIONS, LLC, and MICHAEL KEEGAN, R.N., and grant such other relief as this Court deems just and proper.

    CORRECT CARE SOLUTIONS, LLC, and
       MICHAEL KEEGAN, R.N.

    BY:_____s/Jana L. Brady_____
    HEYL, ROYSTER, VOELKER & ALLEN
          Jana L. Brady
         ARDC #: 6281390

HEYL, ROYSTER, VOELKER & ALLEN
Second Floor, National City Bank Building
120 West State Street
P.O. Box 1288
Rockford, Illinois 61105 1288
Telephone  815.963.4454
Facsimile  815.963.0399

14153-35
JLB

## PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument, Response to Motion for Preliminary Injunction, was served upon all attorneys to the above cause via the CM/ECF System on the 5th day of  May , 2017.

TO:

**Attorneys for Plaintiff**
Sheila A. Bedi
Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-1271
Sheila.bedi@law.northwestern.edu
Vanessa.delvalle@law.northwester.edu

**Attorneys for Plaintiff**
Sheila A. Bedi
Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-1271
Sheila.bedi@law.northwestern.edu
Vanessa.delvalle@law.northwester.edu
gmhoffman@co.mchenry.il.us

**Attorney for Ricardo Wong**
Craig Arthur Oswald
United States Attorney's Office
219 South Dearborn Street
Chicago, IL 60604
(312) 353-5300
craig.oswald@usdoj.gov

**Attorneys for \***
"Julie" Yihong Mao
Sejal Zota
National Immigration Project of the National Lawyers Guild
14 Beacon Street, Suite 602
Boston, MA 02108
(617) 227-9727
julie@nipnlg.ort
sejal@nipnlg.org

"Julie" Yihong Mao
Sejal Zota
National Immigration Project of the National Lawyers Guild
14 Beacon Street, Suite 602
Boston, MA 02108
(617) 227-9727
julie@nipnlg.ort
sejal@nipnlg.org

**Attorney for CORRECT CARE SOLUTIONS, LLC, and MICHAEL KEEGAN, R.N.**
Jana L. Brady
HEYL, ROYSTER, VOELKER & ALLEN
120 West State Street, Second Floor
P.O. Box 1288
Rockford, Illinois 61105 1288
Telephone  815.963.4454
Facsimile  815.963.0399

16

14153-35
JLB

***Attorney for McHenry County, McHenry County Sheriff Bill Prim, Chief of Corrections David Devane***
George M. Hoffman
McHenry County State's Attorney's Office
2200 N. Seminary Ave, Ste. 150
Woodstock, IL 60098

                                                                                                                                                      s/Jana L. Brady
                                                                                                                                                       Jana L. Brady