**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WILMER CATALAN-RAMIREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-3258 |
| | ) | |
| RICARDO WONG, Field Office Director, | ) | |
| Chicago, U.S. Immigration and Customs | ) | The Hon. Joan H. Lefkow |
| Enforcement ("ICE"), ICE AGENT | ) | Magistrate Judge Jeffrey Cole |
| JASON HINES, ICE AGENT | ) | |
| PATRICK RANSFORD, ICE AGENT | ) | |
| JAY WARRAN, ICE AGENT JASON | ) | |
| LAFERRIERE, ICE AGENT ERIK POWE, | ) | |
| ICE AGENT FRANCISCO TREVINO, ICE | ) | |
| AGENT CHRISTOPHER STRUHART, | ) | |
| MCHENRY COUNTY, | ) | |
| MCHENRY COUNTY SHERIFF BILL PRIM, | ) | |
| CHIEF OF CORRECTIONS DAVID | ) | |
| DEVANE, CORRECT CARE SOLUTIONS, | ) | |
| HEALTH ADMINISTRATOR MIKE | ) | |
| KEEGAN, SUPERINTENDENT EDDIE | ) | |
| JOHNSON, COMMANDER CHRISTOPHER | ) | JURY TRIAL DEMANDED |
| KENNEDY, COMMANDER ALFRED | ) | |
| NAGODE, CHICAGO POLICE OFFICER | ) | |
| RYAN KING (#18362), | ) | |
| CHICAGO POLICE OFFICER TOMAS | ) | |
| ROSALES (#14583), CHICAGO POLICE | ) | |
| OFFICER ANGEL COLON (#13373), | ) | |
| CHICAGO POLICE OFFICER SAMUEL | ) | |
| LOPEZ (#5628), and CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT[1]**

---

[1] The amendments to this complaint apply solely to the CPD Defendants and the ICE Defendants. Plaintiff has not changed any of the factual allegations related to the CCS Defendants and the County Defendants. Plaintiff is currently in settlement negotiations with the

Plaintiff Wilmer Catalan-Ramirez, by his undersigned attorneys, for his complaint against U.S. Immigration and Customs Enforcement ("ICE") Field Office Director Ricardo Wong, ICE's Homeland Security Investigations (HSI) Agent Jason Hines, HSI Agent Patrick Ransford, HSI Agent Jay Warran, HSI Agent Jason Laferriere, ICE's Enforcement and Removal Operations (ERO) Agent Erik Powe, ERO Agent Francisco Trevino, ERO Agent Christopher Struhart, McHenry County, McHenry County Sheriff Bill Prim, Chief of Corrections David Devane, Correct Care Solutions, Health Administrator Mike Keegan, Superintendent Eddie Johnson, Commander Christopher J. Kennedy, Commander Alfred Nagode, Chicago Police Officer Ryan King, Chicago Police Officer Tomas Rosales, Chicago Police Officer Angel Colon, Chicago Police Officer Samuel Lopez, and the City of Chicago, alleges as follows:

## INTRODUCTION

1.      This action is brought pursuant to 42 U.S.C. § 1983 and the authority of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), to redress the deprivation under color of law of Mr. Catalan-Ramirez's rights as secured by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

2.      Mr. Catalan-Ramirez, devoted partner and the father of young U.S. citizen children, was the primary breadwinner for his family as a mechanic in a body shop.  He resided with his children and their mother in the Back of the Yards neighborhood in Chicago.

3.      On January 15, 2017, as Mr. Catalan-Ramirez was leaving a restaurant in the Back of the Yards neighborhood, he was the victim of a drive-by shooting.  He sustained multiple gunshot wounds that fractured his right skull and right shoulder, a traumatic brain

---

CCS and County Defendants and hopes to resolve the claims against these Defendants in the near future.

injury, and partial paralysis on his left side. These injuries all require medical attention and rehabilitative services. As a result of these injuries, Mr. Catalan-Ramirez requires a left-side ankle brace and proper sneaker footwear to safely walk. He also requires multiple medications daily and physical therapy three times a week. Because he does not have use of his left arm, Mr. Catalan-Ramirez cannot feed, bathe, or dress himself properly without assistance. As a result of his traumatic brain injury, Mr. Catalan-Ramirez also lives with cognitive deficits.

4. On March 27, 2017, seven ICE agents forced entry into Mr. Catalan-Ramirez's home without a warrant or consent. During this illegal raid, several ICE agents slammed Mr. Catalan-Ramirez on the ground and fractured his left shoulder, despite his pleas of pain and repeated notifications of his shooting-related injuries. The agents' use of force against Mr. Catalan-Ramirez was wholly unnecessary and disproportionate as Mr. Catalan-Ramirez did not resist in any way when the agents arrested him.

5. As a result of the agents' actions, Mr. Catalan-Ramirez sustained several injuries and continues to experience a deep sense of pain, humiliation, and fear.

6. Upon information and belief, ICE conducted this raid based on false information obtained from the Chicago Police Department's Gang Database and/or another mechanism for tracking suspected gang members indicating that Mr. Catalan-Ramirez was a member of a Chicago street gang. Mr. Catalan Ramirez is not, nor has he ever been a member of a Chicago street gang.

7. After the raid, ICE took Mr. Catalan-Ramirez to McHenry County Adult Correctional Facility ("McHenry County Jail"), where he is currently detained. The McHenry County Jail has a contract with ICE to hold immigration detainees pending the resolution of their removal cases. While at McHenry County Jail, Mr. Catalan-Ramirez is being denied necessary

medical care for the injuries he sustained during the January 2017 shooting and the additional injuries sustained as a result of the ICE agents' actions. As a result, Mr. Catalan-Ramirez is experiencing a number of medical issues including but not limited to extreme pain in his left shoulder and arm, losing sight in his left eye, and losing range of motion on the left side of his body. Mr. Catalan-Ramirez spends most of the day isolated in his cell due to the pain and his inability to safely walk without his left-side ankle brace and proper sneaker footwear.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331.

9.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

### Plaintiff

10.     Plaintiff Mr. Catalan-Ramirez is an immigrant of Latin American descent and resident of Chicago, Illinois. Mr. Catalan-Ramirez has been detained by ICE at the McHenry County Jail in Woodstock, Illinois since March 27, 2017. Under the Americans with Disabilities Act, Mr. Catalan-Ramirez qualifies as a person with a serious disability.

### Defendants

### ICE Defendants

11.     Defendant Ricardo Wong was at all times mentioned herein the Field Office Director of the Chicago ICE Field Office. At all times relevant to the events at issue in this case, Defendant Wong was acting under color of authority of the Department of Homeland Security. Defendant Wong oversees the Chicago ICE Field Office's functions and operations and the immigration detainees within its jurisdiction. Upon information and belief, Defendant Wong

was the final policy-making authority for the raid of Mr. Catalan-Ramirez's home and is legally responsible for the violations against Mr. Catalan-Ramirez as alleged herein. Defendant Wong is also responsible for the transportation and oversight of immigration detainees in McHenry County Jail. He is sued in his individual and official capacity.

12.     Defendants Agent Jason Hines, Agent Patrick Ransford, Agent Jay Warran, Agent Jason Laferriere, Agent Erik Powe, Agent Francisco Trevino, and Agent Christopher Struhart are officials of the U.S. Immigration and Customs Enforcement. At all times relevant to the events at issue in this case, these Defendants were acting under color of authority of the Department of Homeland Security. On information and belief, these ICE agents were onsite at Mr. Catalan-Ramirez's home and were personally involved in the violations against Mr. Catalan-Ramirez. They are sued in their individual capacities.

### McHenry County Defendants

13.     Defendant Bill Prim is the Sheriff of McHenry County. At all times relevant to the events at issue in this case, Defendant Prim was employed by the McHenry County Sheriff's Department in the capacity of Sheriff. As such, he was acting under color of law. At all times relevant to the events at issue in this case, Defendant Prim promulgated rules, regulations, polices, and procedures as Sheriff of McHenry County for the provision of certain health care by medical personnel and correctional officers to detainees at the McHenry Jail. He is sued here in his official capacity.

14.     Defendant David Devane is the Chief of Corrections at McHenry County Jail. At all times relevant to the events at issue in this case, Defendant Devane was employed by the McHenry County Sheriff's Department. As such, he was acting under color of law. At all times relevant to the events at issue in this case, Defendant Devane was responsible for implementing

the policies and procedures promulgated by Defendant Prim, supervising all staff, and managing all aspects of Jail operations. He is sued here in his official capacity.

15. Defendant McHenry County is a county of the State of Illinois. It oversees the McHenry County Sheriff's Department, which, in turn, operates the McHenry County Jail.

**Correct Care Solutions Defendants**

16. Defendant Correct Care Solutions ("CCS") is a corporation headquartered in Nashville, Tennessee transacting business in Illinois. CCS, pursuant to a contract with McHenry County, provides medical and mental health evaluation, care, and treatment to detainees at McHenry County Jail. At all times relevant to the events at issue in this case, CCS was responsible for the implementation, oversight, and supervision of policies and practices at McHenry County Jail related to the provision of medical and mental health care. As an agent of McHenry County, CCS was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including the doctor and nurses who work at the Jail.

17. Defendant Mike Keegan is the Health Administrator at McHenry County Jail and was employed by CCS during the relevant period. At all times relevant to the events at issue in this case, Defendant Keegan was acting under color of law and within the scope of his employment with CCS. Defendant Keegan was and is responsible for the medical care, treatment, and welfare of Mr. Catalan-Ramirez while he is detained at the Jail, and he has failed in that responsibility. Defendant Keegan is sued here in his official capacity.

**CPD Defendants**

18. Defendant Eddie Johnson is the Superintendent of the Chicago Police Department. At all times relevant to the events at issue in this case, Defendant Johnson was

employed by the Chicago Police Department.  As such, he was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Johnson promulgated rules, regulations, polices, and procedures at the Chicago Police Department.  Defendant Johnson is responsible for supervising all CPD officers and managing all operations at the CPD.  He is sued here in his official capacity.

19.     Defendant Christopher J. Kennedy is the Commander of the Gang Investigations Division and Defendant Alfred Nagode is the Deputy Chief of the Gang Enforcement Division. At all times relevant to the events at issue in this case, Defendants Kennedy and Nagode were employed by the Chicago Police Department.  As such, they were acting under color of law.  At all times relevant to the events at issue in this case, Defendants Kennedy and Nagode were in charge of maintaining and updating the CPD's Gang Database.  They are sued here in their official and individual capacities.

20.     Defendant Chicago Police Department Officers Ryan King, Tomas Rosales, Angel Colon, and Samuel Lopez were employees of the Chicago Police Department during the relevant time period.  At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the Chicago Police Department.  These defendants wrongfully labeled Mr. Catalan-Ramirez as a Chicago street gang member and included him in CPD's Gang Database.  These defendants are sued here in their individual capacities.

21.     Defendant City of Chicago is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Illinois.

## FACTUAL ALLEGATIONS

### The Raid

22.     On the morning of March 27, 2017, Defendants Agent Jason Hines, Agent Erik Powe, and Agent Francisco Trevino approached Celene Adame, Mr. Catalan-Ramirez's partner, outside her front yard.  These ICE agents did not identify themselves to Ms. Adame.  They were wearing bullet proof vests with "police" written on the vests.  They presented a picture to Ms. Adame and asked whether she recognized the person in the picture.  Assuming that they were local police, Ms. Adame replied that she did not recognize the person in the picture.  The men then asked her where she was going and she explained that she was going to drop off her children at the school across the street.

23.     When Ms. Adame returned home, the same men were inside her walled yard and on the exterior stairs approaching her residence on the third floor of the apartment building.  The men asked her again if she recognized the person in the picture, and she again replied that she did not.  The men then asked if they could speak with her husband, and she explained that they could not because he was sleeping.  She politely asked the men to leave.

24.     Ms. Adame then heard her three-year-old son crying inside the apartment and yelling "mama," so she opened the door to let herself in.  When she opened the door, she saw that two different ICE agents were already inside her apartment.  Ms. Adame believes that these men entered her apartment through the kitchen door in the back, which she left unlocked.

25.     When she was standing by the door, Ms. Adame also noticed that there were two additional ICE agents outside going up to the attic.  The attic is part of the building, next to the porch, and can be reached by climbing up some steps.

26.     When Ms. Adame opened the door and saw the two agents already inside her apartment, she turned toward the agents standing beside her and asked them, "what are you doing here? Can you please leave?" The agents ignored her and went inside the apartment. The agents did not ask for permission before entering her apartment. Ms. Adame did not give them permission to enter, nor did any other resident of the home. The ICE agents also did not present Ms. Adame a warrant to enter her apartment.

27.     When she entered the apartment, the two agents who were already inside had flashlights and were going room by room—they checked the bathroom, the children's bedroom, and Ms. Adame's and Mr. Catalan-Ramirez's bedroom.

28.     One of the ICE agents who is Latino asked Ms. Adame, "where are the guns and drugs?" Ms. Adame replied, "what guns or drugs?" She repeatedly told him that the man they were looking for is not her husband, and that they were looking for a different person.

29.     Mr. Catalan-Ramirez was asleep in his bedroom. ICE agents went to the bedroom and tried to wake up Mr. Catalan-Ramirez. Ms. Adame also approached the bedroom. The ICE agents flashed their flashlight on Mr. Catalan-Ramirez's face and pulled the covers off him. Mr. Catalan-Ramirez woke up and stood up with one leg and slowly hobbled out to the living room because he was unable to walk properly without his brace and sneakers.

30.     The ICE agents asked for Mr. Catalan-Ramirez's and Ms. Adame's identification. Assuming they were police because the ICE agents never identified themselves, Ms. Adame provided the men with Mr. Catalan-Ramirez's birth certificate and copy of his passport.

31.     Ms. Adame repeatedly asked the ICE agents if they had a warrant. She also asked the agents who they were and why they were here. The ICE agents never answered. Upon information and belief, the ICE agents did not have a warrant that permitted them to enter or

search Mr. Catalan-Ramirez's home or to detain him without voluntary consent or exigent circumstances.

32.     At some point, while they were questioning Mr. Catalan-Ramirez, the Agent Jason Hines, Agent Patrick Ransford, and Agent Erik Powe began to surround Mr. Catalan-Ramirez.

33.     Fearing an arrest, Mr. Catalan-Ramirez told the agents in English that he is sick and that he is paralyzed on his left side.  He politely asked that if they were going to arrest him, to please handcuff him in the front.

34.     One of the agents took Mr. Catalan-Ramirez's right hand and put his arm behind his back.  Another agent took Mr. Catalan-Ramirez's left hand and tried to put his arm behind his back, but because his left arm is partially paralyzed, the arm was hard to maneuver.  At that point, the ICE agents slammed Mr. Catalan-Ramirez to the floor. Agents Hines, Ransford, and Powe pinned him to the ground.  One of these agents kneed him in the back.  Mr. Catalan-Ramirez again asked that his hands be handcuffed in the front rather than the back because of his injuries.  Ignoring his pleas, an agent twisted Mr. Catalan-Ramirez's arm and handcuffed him tightly from the back.  Mr. Catalan-Ramirez begged the agents to stop, yelling "mi brazo", "mi brazo," "quebra mi brazo" (you are breaking my arm).  The agents also slammed his head on the floor, causing him immediate pain due to his prior skull fracture and traumatic brain injury. Crying, Mr. Catalan-Ramirez tried to tell the agents about the pain in both his head and shoulder, but they did not appear to believe him.

35.     While Agents Hines, Ransford, and Powe were aggressively arresting Mr. Catalan-Ramirez, another three agents or so grabbed Ms. Adame, threw her on the sofa, and attempted to forcibly hold her on the sofa.  While she was witnessing the agents' brutal attack on

her husband, Ms. Adame explained to the agents in Spanish that Mr. Catalan-Ramirez had been a victim of a crime and that half of his body was paralyzed. At least one of the ICE agents spoke Spanish and clearly understood what she was saying.

36.     When Mr. Catalan-Ramirez was on the ground being handcuffed, he yelled out to Ms. Adame to film. Ms. Adame eventually retrieved her phone from the kitchen and began taping the arrest. The ICE agents ordered her to stop taping and tried to take her phone away, but she told them no and continued taping. After she began taping, the agents stopped questioning Mr. Catalan-Ramirez.

37.     Mr. Catalan-Ramirez's and Ms. Adame's three-year-old son witnessed the ICE agents' arrest of his father. He was crying, screaming, and appeared frightened. The ICE agents yelled at him to go to his room, but he stayed in the living room with his parents. He repeatedly asked the ICE agents to let his father go. Their son continues to have nightmares regarding the ICE raid and the arrest of his father in which he wakes up late at night frightened and screaming for his father.

38.     As a result of the home raid and the ICE agents' brutality, both Ms. Adame and her three-year old son have suffered trauma and emotional distress. Both are now fearful of police and experience constant anxiety.

39.     After the ICE agents arrested Mr. Catalan-Ramirez, they grabbed him from behind and partly carried him away to their car. Mr. Catalan-Ramirez could not walk properly without the use of his ankle brace, and so two agents had to lift him up by his arms, causing him further pain in his left shoulder. The agents would not let him bring his ankle brace. The agents also would not let Mr. Catalan-Ramirez bring all of his necessary medications. Mr. Catalan-Ramirez was taken out of the apartment wearing nothing but sandals, shorts, and a T-shirt.

40.     At no time before placing Mr. Catalan-Ramirez under arrest did the ICE agents ask Mr. Catalan-Ramirez about his legal right to be in the United States, nor did Mr. Catalan-Ramirez tell the agents anything about his immigration status.

41.     After the ICE agents placed Mr. Catalan-Ramirez in their car, he continued to cry from all the pain he was experiencing.  The ICE agents then drove Mr. Catalan-Ramirez to the emergency room at Loyola Hospital.  The doctor at Loyola Hospital diagnosed Mr. Catalan-Ramirez with a fractured left shoulder and recommended that he see an orthopedic specialist immediately to get treatment.

42.     After the hospital, the ICE agents drove Mr. Catalan-Ramirez to the ICE field office for processing.  While there, one ICE agent asked Mr. Catalan-Ramirez if he was associated with any gangs.  Mr. Catalan-Ramirez replied "no."  Mr. Catalan-Ramirez is not and has never been a member of any Chicago street gang.

**ICE Targeted Mr. Catalan-Ramirez Because It Received False Information from the Chicago Police Department**

43.     The Chicago Police Department maintains a Gang Database of all suspected gang members in the City of Chicago.  This Gang Database is arbitrary, over-inclusive, and contains false information.  Many people are included in the Gang Database who are not in fact members of any street gang.   Upon information and belief, the Chicago Police Department also uses a number of other similarly arbitrary, over-inclusive mechanisms to track and report on people who are suspected of gang membership.  These other mechanisms are also riddled with false information.

44.     On June 16, 2015, Defendant Officers Ryan King and Tomas Rosales approached Mr. Catalan-Ramirez while he was outside his neighbor's home in the Back of the Yards neighborhood.  According to the Defendant Officers, the reason for stopping Mr. Catalan-

12

Ramirez was because he was loitering with another individual in a known Latin Saint street gang/narcotic area and an area of recent gang violence. In fact, Mr. Catalan-Ramirez was simply spending time with his friends and their children outside. The Defendant Officers subsequently filled out a contact card in which they labeled Mr. Catalan-Ramirez a Latin Saints gang member and entered his information into CPD's Gang Database.

45. Curiously, a subsequent entry in CPD's gang database on November 21, 2016, lists Mr. Catalan-Ramirez as a Satan Disciple gang member. The Satan Disciples and the Latin Saints are rival gangs; both claim territory in the Back of the Yards neighborhood. On that day, Mr. Catalan-Ramirez was in his vehicle driving just a few blocks from his home when Defendant Officers Angel Colon and Samuel Lopez pulled him over for allegedly failing to stop at a stop sign. The Defendant Officers proceeded to arrest Mr. Catalan-Ramirez for failing to stop at a stop sign and driving on a suspended license. The Defendant Officers then entered Mr. Catalan-Ramirez's information into CPD's gang database and labeled him as a Satan Disciple.

46. Defendant Officers King, Rosales, Colon, and Lopez all wrongly assumed Mr. Catalan-Ramirez was a gang member because he was a young Latino who lived in a neighborhood that was considered to be gang territory. Mr. Catalan-Ramirez is not a gang member and has never been a member of any Chicago street gang.

47. Neither the Defendant Officers nor any other member of the CPD ever confronted Mr. Catalan-Ramirez with any evidence that he was gang-affiliated before including him in the Gang Database and/or another mechanism for tracking suspected gang members, nor did they ever inform him of his inclusion in the Gang Database and/or another mechanism for tracking suspected gang members. Mr. Catalan-Ramirez also never had the opportunity to challenge his inclusion in the Gang Database and/or another mechanism for tracking suspected gang members.

13

48.     The U.S. Immigration and Customs Enforcement's (ICE) Homeland Security Investigations (HIS) has an ongoing operation nationwide called Operation Community Shield in which they target foreign born members of violent street gangs.  From March 26, 2017, through May 6, 2017, the Chicago filed office of ICE conducted a Community Shield Operation targeting foreign born members of violent street gangs.  Mr. Catalan-Ramirez was targeted by ICE as part of this operation because ICE received false information from the CPD indicating that Mr. Catalan-Ramirez was a gang member.

49.     An ICE deportation officer, Officer "Pols," confirmed that ICE received information that Mr. Catalan-Ramirez was affiliated with a Chicago street gang from the Chicago Police Department and that ICE targeted Mr. Catalan-Ramirez as part of its gang operations.

50.     Upon information and belief, in the past recent months, ICE has conducted a number of raids in primarily Latino neighborhoods in Chicago as part of Operation Community Shield.  ICE agents have arrested a number of individuals during these raids who they perceived to be gang members due to false information they received from the Chicago Police Department.

51.     On the same day that Mr. Catalan-Ramirez was arrested by ICE, ICE raided another home and attempted to arrest a young man who is a U.S. citizen, and ended up shooting his father in the process.  ICE indicated on Twitter that this raid was a part of "a gang op."  The young man is not a gang member.

52.     Upon information and belief, ICE is receiving false information that individuals are gang members from the Chicago Police Department's Gang Database.

53.     The City of Chicago is a "sanctuary city."  The Welcoming City Ordinance, which was first passed by City Council in 2012 and most recently amended in 2016, provides

14

certain protections to undocumented immigrants. Among those protections, the Chicago Police Department cannot share information regarding an individual's immigration status with federal authorities unless required to do so by federal law. However, the Welcoming City Ordinance does not prohibit the Chicago Police Department from sharing other information about an individual with ICE, such as all the identifying information about individuals contained in CPD's Gang Database.

54.     The City of Chicago is therefore not a sanctuary city for those individuals like Mr. Catalan-Ramirez who have been falsely labeled by CPD as a gang member and then subsequently targeted by ICE because CPD shared this false information.

55.     Upon information and belief, gang databases disproportionately identify African American and Latino men as gang members. "Research indicates that law enforcement gang task forces often label large numbers of youth of color as gang members with little or no evidence of gang involvement. This racism is further increased by a complete refusal to recognize and address primarily white gangs." Lillian Dowdell Drakeford, *The Race Controversy in American Education* (2015), at 160. Examples of this racial bias are seen in: the Los Angeles County gang database, where approximately half of all African American men between the ages of 16 and 24 are listed as gang members or associates, *id.*; the Denver Police Department gang database, where 2 out of every 3 African American males in Denver were listed as a gang member and 1 out of every 4 Latinos, Julie Barrows & C. Ronald Huff, *Gang & Public Policy: Constructing and Deconstructing Gang Databases*, 8 CRIMINOLOGY & PUB. POL'Y 675, 683 (2009); and the Minnesota gang database, which is 44 percent African American and 36 percent white, K. Babe Howell, *Fear Itself: The Impact of Allegations of Gang Affiliation on Pre-trial Detention*, 23 ST. THOMAS L. REV. 620 (2011). "The vague criteria, secrecy of the

15

process, and lack of judicial review create a danger that police officers add many young, minority males to the database simply because they wear hip-hop clothing and live in poverty-stricken, high-crime areas." Linda S. Beres & Thomas D. Griffith, *Demonizing Youth*, 34 LOY. L.A. L. REV. 747, 761 (2001).

56.     City of Chicago officials know that the Gang Database is rife with inaccuracies and that many individuals included in the database have no gang affiliation.  City of Chicago officials know that when this false information is provided to ICE it will be used against individuals in removal proceedings and that individuals have no recourse to challenge their inclusion in the database.

**Deficient Medical Care at McHenry County Jail**

57.     Mr. Catalan-Ramirez was transported to McHenry County Jail on March 27, 2017.

58.     Mr. Catalan-Ramirez is experiencing significant pain in his left shoulder as a result of the fracture he sustained during his arrest by the ICE agents.  He has been seen once by an orthopedic doctor at Mercy Woodstock Medical Center, and he is still waiting on a follow up appointment to receive treatment.  The delay in treatment of his shoulder could cause worsening and perhaps permanent injury.

59.     When ICE agents slammed Mr. Catalan-Ramirez's head on the ground during the arrest, they further exacerbated his traumatic brain injury.  As a result, Mr. Catalan-Ramirez is now losing sight in his left eye and is experiencing numbness on the left side of his face.  After repeated requests for medical treatment by Mr. Catalan-Ramirez and his counsel, the medical staff at the McHenry County Jail finally referred Mr. Catalan-Ramirez to a neurologist on April 20, 2017, however, that appointment still has not occurred to this date.

16

60.     Prior to Mr. Catalan-Ramirez's arrest, he was receiving out-patient therapy three times a week.  The therapy was helping him gain motion back in his left arm, hand, leg, and foot. Mr. Catalan-Ramirez's rehabilitation was progressing and he was beginning to slowly walk again in the days before he was arrested.

61.     Since being detained at McHenry County Jail, Mr. Catalan-Ramirez has been unable to obtain the necessary physical therapy and as a result, he is losing range of motion on his left side and regressing in his rehabilitation.  His left arm is now completely unmovable.

62.     After repeated requests for medical treatment by Mr. Catalan-Ramirez and his counsel, the medical staff at the McHenry County Jail finally referred Mr. Catalan-Ramirez to an occupational and physical therapist on April 20, 2017, however, Mr. Catalan-Ramirez still has not received these appointments to this date.  Mr. Catalan-Ramirez faces serious risk of permanent damage because of this over month-long interruption in rehabilitation services.  If Mr. Catalan-Ramirez does not receive the necessary rehabilitative services immediately, he could become permanently physically disabled.

63.     Ms. Adame was able to provide Mr. Catalan-Ramirez his ankle brace after he was placed in custody.  However, after about two weeks at the Jail, the binding strap on Mr. Catalan-Ramirez's ankle brace broke, leaving him unable to use the brace and walk safely within the Jail. Medical staff at the Jail have refused Mr. Catalan-Ramirez's request to replace his brace. Additionally, Mr. Catalan-Ramirez is unable to wear the proper sneaker footwear in the Jail in order to wear his leg brace.  He has requested to receive the proper sneaker footwear, but security and medical staff have refused his request.  Without the proper sneaker footwear and brace, Mr. Catalan-Ramirez risks serious injury, particularly because of his existing brain injury.

Because Mr. Catalan-Ramirez cannot walk safely around the Jail, he spends most of his days in his cell.

64.     Mr. Catalan-Ramirez requires a number of medications to deal with the pain from all of his injuries and medication to help treat his paralysis. The medical staff at McHenry County Jail have recently stopped giving Mr. Catalan-Ramirez his medication that helps treat his paralysis.

65.     On or around April 12, 2017, the doctor at the Jail, Dr. Young Kim, interrogated Mr. Catalan-Ramirez about his medical requests and communications with counsel. Dr. Kim accused Mr. Catalan-Ramirez of misrepresenting his injuries and medical needs. Mr. Catalan-Ramirez felt that the intended goal of the meeting was to intimidate him and convince him that he did not have urgent and unresolved medical needs.

66.     Due to his injuries, Mr. Catalan-Ramirez cannot dress, feed, or bathe himself properly without assistance. Before he was arrested, Mr. Catalan-Ramirez relied on Ms. Adame to help him with all his daily needs. Furthermore, his left arm is in a sling due to his fractured shoulder and he has lost all motion in his left arm and hand due to the interruption in his physical therapy. He has repeatedly requested assistance from correctional officers and nurses, but they refuse to help him. When Mr. Catalan-Ramirez attempts to dress, feed, and bath himself without the assistance of others, he experiences significant pain.

67.     Mr. Catalan-Ramirez has gone days without showering because it is very difficult and painful for him to bathe himself. Mr. Catalan-Ramirez also has gone days without changing his clothes because he relies on other detainees to help him put on his pants and shirt. He also relies on other detainees to help him prepare and eat his food.

68.     Mr. Catalan-Ramirez has been reprimanded by correctional officers for enlisting other detainees' help in dressing, eating, and putting on his ankle brace.  When one correctional officer saw Mr. Catalan-Ramirez receiving help from another detainee, the officer threatened to place Mr. Catalan-Ramirez and any person assisting him in segregation as punishment if they continued to help him.  Because of the officer's threats, some detainees are now afraid to help Mr. Catalan-Ramirez.  Without the assistance of detainees or staff, Mr. Catalan-Ramirez continues to struggle meeting his basic needs.

69.     The correctional officers also bully and harass Mr. Catalan-Ramirez because of his disabilities.  Officers have taunted him, made fun of him, and used slurs against him, including calling him gay when he has asked for their assistance in dressing.

70.     Due to the extreme pain Mr. Catalan-Ramirez is experiencing throughout his body, he cannot sleep at night.  The pain is worsening each day.

71.     As a result of his arrest by ICE agents, and his detention at McHenry County Jail, Mr. Catalan-Ramirez suffered and continues to suffer extreme emotional distress.  He is exhibiting symptoms of depression, including insomnia, depressed mood, fatigue, crying episodes, and diminished concentration.  He feels humiliated and dehumanized by the staff at the Jail.  He is extremely stressed and does not feel like he can last much longer at the Jail.

**Mr. Catalan-Ramirez is Forced to Wear Shackles During Transport**

72.     Mr. Catalan-Ramirez has been transported out of McHenry County Jail on a number of occasions to attend immigration court hearings and to go to the hospital.  Each time he is transported, his hands and legs are shackled.

73.     It is the policy and practice at McHenry County Jail to handcuff and shackle all detainees during transport for security purposes.

74.     The shackles make it even more difficult for Mr. Catalan-Ramirez to walk.  The shackles cause Mr. Catalan-Ramirez extreme physical pain due to his many injuries, embarrassment, humiliation, and mental and emotional distress.  Mr. Catalan-Ramirez feels like he is being unfairly treated like an animal and a criminal.  He feels that being forced to wear shackles falsely portrays him as a dangerous person.

75.     Mr. Catalan-Ramirez has no history of violence or disruption in custody or in court and would pose no threat to the safety and security of others or threat of flight if allowed to be transported without physical restraints.

76.     The transport vans at the McHenry County Jail are not equipped with seatbelts. When Mr. Catalan-Ramirez is transported, he is not provided with a seatbelt.  Mr. Catalan-Ramirez's safety is thus at risk each time he is transported out of McHenry County Jail.

### Mr. Catalan-Ramirez's Damages

77.     Mr. Catalan-Ramirez experienced a traumatic and violent arrest at the hands of unidentified ICE agents precipitated by false information gathered from the CPD's Gang Database and/or another mechanism for tracking suspected gang members.  As a result, Mr. Catalan-Ramirez—apart from the emotional pain and humiliation he endured—sustained, among other things, a fractured shoulder, loss of eyesight, and additional paralysis on his left side.

78.     Mr. Catalan-Ramirez continues to experience pain and injury as a result of the harm inflicted on him by ICE agents and fails to receive appropriate medical care in McHenry County Jail.

79.     As a result of the foregoing, Mr. Catalan-Ramirez has suffered and continues to suffer tremendous damages, including but not limited to physical harm, mental suffering, and loss of a normal life, all directly and proximately caused by the Defendants' actions.

## COUNT I –UNLAWFUL ENTRY AND UNREASONABLE SEIZURE
**(Fourth Amendment Claim for Damages under *Bivens* Against Defendants Wong and ICE Agents Hines, Ransford, Warran, Laferriere, Powe, Trevino, and Struhart)**

80.     Mr. Catalan-Ramirez repeats and realleges the preceding paragraphs as if fully set forth in this Count.

81.     Count I is alleged against Defendants Ricardo Wong and ICE Agents Hines, Ransford, Warran, Laferriere, Powe, Trevino, and Struhart .

82.     ICE Agents Hines, Ransford, Warran, Laferriere, Powe, Trevino, and Struhart violated Mr. Catalan-Ramirez's Fourth Amendment right to be free from unreasonable searches when they entered his home without a judicial warrant or voluntary consent, and without probable cause or the presence of any exigent circumstances.

83.     Upon information and belief, Defendant Ricardo Wrong, as Field Office Director of the Chicago ICE Field Office, was the final policy-making authority for the raid of Mr. Catalan-Ramirez's home and authorized the ICE agents to enter Mr. Catalan-Ramirez's home without a warrant or consent, in violation of the Fourth Amendment.

84.     Defendants ICE Agents Hines, Ransford, Warran, Laferriere, Powe, Trevino, and Struhart violated Mr. Catalan-Ramirez's Fourth Amendment right to be free from unreasonable seizures when they seized, detained, and arrested him without a judicial warrant or reasonable suspicion or probable cause that he was committing crime.

85.     As a result of the unjustified and unconstitutional conduct of Defendants Wong and ICE Agents Hines, Ransford, Warran, Laferriere, Powe, Trevino, and Struhart, Mr. Catalan-Ramirez suffered damages, including but not limited to, actual damages, loss of liberty, humiliation, fear, and emotional distress.

## COUNT II – EXCESSIVE FORCE
**(Fourth Amendment Claim for Damages under *Bivens* Against Defendants ICE Agents Hines, Ransford, and Powe)**

86.     Mr. Catalan-Ramirez repeats and realleges the preceding paragraphs as if fully set forth in this Count.

87.     Count II is alleged against Defendants ICE Agents Hines, Ransford, and Powe.

88.     By physically seizing Mr. Catalan-Ramirez and needlessly slamming him into the floor, banging his head on the floor, kneeing him in the back, aggressively handcuffing him behind the back, and fracturing his shoulder, even though he had offered no resistance to the agents, the Defendant ICE Agents used excessive force against Mr. Catalan-Ramirez, and in doing so, violated his Fourth Amendment rights to be free from the use of unreasonable or excessive force.

89.     As a result of the use of excessive force, Mr. Catalan-Ramirez suffered damages, including but not limited to, actual damages, loss of liberty, humiliation, pain, fear, and emotional distress.

## COUNT III – FAILURE TO PROVIDE MEDICAL CARE
**(Fourteenth Amendment Claim for Declaratory and Injunctive Relief under 42 U.S.C. § 1983 Against Defendants Prim, Devane, Keegan, and CCS)**

90.     Mr. Catalan-Ramirez repeats and realleges the preceding paragraphs as if fully set forth in this Count.

91.     Count III is alleged against Defendant Sheriff Prim in his official capacity, Defendant David Devane in his official capacity, Defendant Mike Keegan in his official capacity, and Defendant Correct Care Solutions.

92.     Mr. Catalan-Ramirez was deprived and continues to be deprived of his rights under the Fourteenth Amendment to be provided with adequate medical treatment and care while at the McHenry County Jail.

93.     The Defendants' failures to take appropriate steps to provide Mr. Catalan-Ramirez with adequate treatment for his very serious medical needs, as described more fully in the preceding paragraphs, constitute deliberate indifference to Mr. Catalan-Ramirez's serious medical needs and violate his Fourteenth Amendment rights.  Defendants know of and disregard the substantial risk of injury to Mr. Catalan-Ramirez by failing to provide adequate medical care.

94.     Mr. Catalan-Ramirez seeks injunctive and declaratory relief against all official capacity Defendants and Defendant CCS to prevent the continued violation of his constitutional rights.

## COUNT IV – AMERICANS WITH DISABILITIES ACT ("ADA")
### (ADA Claim for Declaratory and Injunctive Relief Against Defendant Sheriff Prim in his Official Capacity)

95.      Mr. Catalan-Ramirez repeats and realleges the preceding paragraphs as if fully set forth in this Count.

96.     Count IV is alleged against Defendant Sheriff Prim in his official capacity.

97.     As described more fully in the proceeding paragraphs, Mr. Catalan-Ramirez is a qualified person with a physical disability under the Americans with Disabilities Act and his disability is known to the individual Defendants—Mr. Catalan-Ramirez is partially paralyzed on the left side rendering him unable to walk without the use of a leg brace and proper footwear and unable to properly dress, feed, or bathe himself without assistance.  As a result, the Defendants have an obligation to accommodate his disability by providing him with a functioning leg brace and proper footwear and assisting him in his daily activities such as dressing, eating, and

showering. The Defendants intentionally have failed to accommodate Mr. Catalan-Ramirez's physical disability, and these failures have caused Mr. Catalan-Ramirez pain and suffering.

98.     Mr. Catalan-Ramirez seeks injunctive and declaratory relief against Defendant Sheriff Prim in his official capacity to prevent the continued violation of his rights under the ADA.

## COUNT V – RETALIATION
### (First and Fourteenth Amendment Claim for Declaratory and Injunctive Relief under 42 U.S.C. § 1983 Against Defendants Prim, Devane, Keegan, and CCS)

99.      Mr. Catalan-Ramirez repeats and realleges the preceding paragraphs as if fully set forth in this Count.

100.    Count V is alleged against Defendant Sheriff Prim in his official capacity, Defendant David Devane in his official capacity, Defendant Mike Keegan in his official capacity, and Defendant Correct Care Solutions.

101.    Medical staff at the Jail violated Mr. Catalan-Ramirez's rights guaranteed by the First Amendment, as incorporated by the Fourteenth Amendment, when they intimidated him and accused him of misrepresenting his injuries and medical needs after he, through counsel, contacted ICE officials to request urgent medical assistance.

102.    Security staff at the Jail violated and continue to violate Mr. Catalan-Ramirez's rights guaranteed by the First Amendment, as incorporated by the Fourteenth Amendment, by threatening him with placement in segregation whenever he asks for other detainees' assistance with his daily needs.

103.     Mr. Catalan-Ramirez seeks injunctive and declaratory relief against these official capacity Defendants and Defendant CCS to prevent the continued violation of his constitutional rights.

## COUNT VI – DENIAL OF DUE PROCESS
**(Fifth and Fourteenth Amendment Claim for Declaratory and Injunctive Relief under 42 U.S.C. § 1983 Against Defendants Prim, Devane, and Wong)**

104.    Mr. Catalan-Ramirez repeats and realleges the preceding paragraphs as if fully set forth in this Count.

105.    Count VI is alleged against Defendant Sheriff Prim in his official capacity, Defendant Devane in his official capacity, and Defendant Wong in his official capacity.

106.    As a civil immigration detainee, Mr. Catalan-Ramirez has a constitutional liberty interest in being free from physical restraints such as the hard metal shackles that are currently used on his hands and legs when he is transported out of the McHenry County Jail to go to immigration court hearings and the hospital.

107.    By shackling Mr. Catalan-Ramirez every time he is transported out of McHenry County Jail to go to immigration court hearings and the hospital, Defendants' are violating his rights to due process guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

108.    Mr. Catalan-Ramirez seeks injunctive and declaratory relief against these official capacity Defendants to prevent the continued violation of his constitutional rights.

## COUNT VII – DENIAL OF DUE PROCESS
**(Fourteenth Amendment Claim for Declaratory and Injunctive Relief under 42 U.S.C. § 1983 Against Defendant Superintendent Johnson)**

109.    Mr. Catalan-Ramirez repeats and realleges the preceding paragraphs as if fully set forth in this Count.

110.    Count VII is alleged against Defendant Superintendent Eddie Johnson in his official capacity.

111.     The Chicago Police Department maintains a Gang Database consisting of the names and identifying information of individuals who are suspected to be members of street gangs.

112.     The Defendant Officers falsely labeled Mr. Catalan-Ramirez as a member of a Chicago street gang and included his identifying information in the CPD's Gang Database without justification.

113.     Mr. Catalan-Ramirez is not and has never been a member of a Chicago street gang.

114.     Mr. Catalan-Ramirez was never notified by CPD that he was in the Gang Database.  CPD never confronted him with evidence that he was gang-affiliated before including him in the Gang Database.  There is no procedure by which Mr. Catalan-Ramirez can contest his inclusion in the Gang Database.

115.     Upon information and belief, the CPD shares information contained in the Gang Database with ICE.  Through this information sharing, ICE obtained Mr. Catalan-Ramirez's name and address and subsequently arrested Mr. Catalan-Ramirez, in part, because CPD falsely informed ICE that Mr. Catalan-Ramirez is a gang member.

116.     If CPD had not included Mr. Catalan-Ramirez's name in the Gang Database, Mr. Catalan-Ramirez would not have been targeted and prioritized by ICE as part of Operation Community Shield and he would not now be in deportation proceedings.

117.     But for the fact that ICE targeted and prioritized Mr. Catalan-Ramirez's removal from the United States because of false information alleging that he is a Chicago street gang member, he could have begun his applications for asylum and for a U visa while he was living with his family.

118.     The false information that Mr. Catalan-Ramirez is a Chicago street gang member will adversely affect his ability to a U visa.  A U visa is a nonimmigrant visa for victims of certain crimes who have been, or are likely to be, helpful to law enforcement in the investigation or prosecution of a crime.  United States Citizenship and Immigration Services' ("USCIS") may consider any evidence that law enforcement and immigration authorities possess when determining whether to grant a U visa.  There is a substantial likelihood that USCIS will  use the false information that about Mr. Catalan-Ramirez' gang affiliation  against him and deny his U visa petition on that basis.

119.     Mr. Catalan-Ramirez's liberty has been deprived based on false evidence used against him that he could not challenge.

120.     By falsely labeling Mr. Catalan-Ramirez as a Chicago street gang member, including his name in the Gang Database, and then sharing his identifying information with ICE—while knowing that ICE would target Mr. Catalan-Ramirez and use this evidence against Mr. Catalan-Ramirez in removal proceedings, and that this evidence would adversely affect any form of relief Mr. Catalan-Ramirez might seek such as a U visa—the CPD violated Mr. Catalan-Ramirez's Fourteenth Amendment due process right.

121.     The CPD's dissemination of false information regarding Mr. Catalan-Ramirez's gang membership without the precaution of reasonable efforts to guarantee the accuracy of the information restricted Mr. Catalan-Ramirez's liberty without any procedural safeguards designed to prevent such inaccuracies in violation of his constitutional rights.

122.     Mr. Catalan-Ramirez seeks injunctive and declaratory relief against Defendant Superintendent Johnson in his official capacity to prevent the continued violation of his constitutional rights.

## COUNT VIII – DENIAL OF DUE PROCESS
**(Fourteenth Amendment Claim for Damages under 42 U.S.C. § 1983 Against Defendants Superintendent Johnson, Commander Christopher Kennedy, Commander Alfred Nagode, and Officers King, Rosales, Colon, and Lopez)**

123.    Mr. Catalan-Ramirez repeats and realleges the preceding paragraphs as if fully set forth in this Count.

124.    Count VIII is alleged against Defendants Superintendent Eddie Johnson, Commander Christopher J. Kennedy, Commander Alfred Nagode, Officer Ryan King, Officer Tomas Rosales, Officer Angel Colon, and Officer Samuel Lopez.

125.    As explained in detail above, the Chicago Police Department maintains a Gang Database consisting of the names and identifying information of individuals who are suspected to be members of street gangs.

126.    Defendants Kennedy and Nagode are in charge of the divisions of CPD responsible for maintaining, monitoring, and updating the Gang Database.

127.    Defendants Officer King, Officer Rosales, Officer Colon, and Officer Lopez falsely labeled Mr. Catalan-Ramirez as a member of a Chicago street gang and included his identifying information in the CPD's Gang Database without justification.

128.    Mr. Catalan-Ramirez is not and has never been a member of a Chicago street gang.

129.    As explained in detail in Count VII, the CPD violated Mr. Catalan-Ramirez's Fourteenth Amendment due process rights by including him in the Gang Database without affording him any due process protections, and by sharing that false information with ICE while knowing that the false information that Mr. Catalan-Ramirez could not challenge would deprive Mr. Catalan-Ramirez of his liberty.

130.    As a result of the unjustified and unconstitutional conduct of the CPD, Mr.

Catalan-Ramirez suffered damages, including but not limited to, actual damages, loss of liberty, humiliation, pain, fear, and emotional distress.

## COUNT IX – UNLAWFUL POLICY AND PRACTICE
### (*Monell* Claim for Declaratory, Injunctive Relief and Damages under 42 U.S.C. § 1983 Against the City of Chicago)

131.    Mr. Catalan-Ramirez repeats and realleges the preceding paragraphs as if fully set forth in this Count.

132.    Count IX is alleged against Defendant City of Chicago.

133.    The actions of the CPD Defendants were undertaken pursuant to policies and practices of the Chicago Police Department, described above and below, which were ratified by policymakers for the City of Chicago with final policymaking authority.

134.    At all times material to this complaint, Defendant City of Chicago through its Police Department, Police Superintendent, Police Board, Mayor, and City Council had interrelated *de facto* policies, practices, and customs which included, inter alia:

    a.   maintaining a Gang Database consisting of names and identifying information of individuals suspected of being members of Chicago street gangs;

    b.   including individuals in the Gang Database and labeling them as gang members without any justification or evidence proving that they were in fact members of street gangs;

    c.   failing to inform individuals when their information is inputted into the Gang Database;

    d.   failing to have a process by which individuals can challenge their inclusion in the Gang Database;

29

e. failing to have any sort of process by which the information contained in the Gang Database is analyzed for accuracy;

f. communicating information contained in the Gang Database with ICE.

135. The interrelated policies, practices, and customs alleged above were or should have been well-known within the Chicago Police Department, both before and after Mr. Catalan-Ramirez's inclusion in the Gang Database and subsequent arrest by ICE.

136. During the past recent months, a number of individuals have been arrested by ICE based on false information ICE obtained from the CPD regarding the individual's alleged involvement in street gangs. These individuals were not gang members and never had an opportunity to challenge their inclusion in the CPD's Gang Database.

137. Upon information and belief, ICE is using false information that individuals are Chicago street gang members against the individuals in removal proceedings, including at bond hearings.

138. The interrelated policies, practices, and customs alleged above were the direct and proximate cause of the unconstitutional acts committed by the CPD Defendants and the injuries suffered by Mr. Catalan-Ramirez.

139. In addition to damages related to his current injuries, Mr. Catalan-Ramirez seeks injunctive and declaratory relief against the City of Chicago to remedy the city's policies and practices described above that have violated and will continue to violate his constitutional rights.

**COUNT X – ILLINOIS CIVIL RIGHTS ACT ("ICRA")**
**(ICRA Claim for Declaratory, Injunctive Relief and Damages Against Defendant City of Chicago)**

140.     Mr. Catalan-Ramirez repeats and realleges the preceding paragraphs as if fully set forth in this Count.

141.     Count X is alleged against the City of Chicago.

142.     The Illinois Civil Rights Act states, in relevant part, that no unit of State, county, or local government shall "utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5(a)(2).

143.     The City of Chicago, through the actions of the CPD Defendants, caused and perpetuate unlawful discrimination against black and Latino men.

144.     The Chicago Police Department has a policy and practice of including black and Latino men who have not participated in any gang activity in the Gang Database for no justifiable reason other than their race and national origin.

145.     Mr. Catalan-Ramirez is not a Chicago street gang member and the CPD Defendants only labeled him as a gang member and included his information in the Gang Database because of his race and ethnicity.  The CPD Defendants treated Mr. Catalan-Ramirez differently because of his race and national origin in violation of ICRA.

146.     As a result of the CPD Defendants' actions, Mr. Catalan-Ramirez suffered damages, including but not limited to, actual damages, loss of liberty, humiliation, pain, fear, and emotional distress.

147.     Mr. Catalan-Ramirez seeks injunctive and declaratory relief against the City of Chicago to prevent the continued violation of his rights to be free from discrimination pursuant to ICRA.

## COUNT XI – INDEMINIFICATION
### (State Law Claim Against the City of Chicago)

148.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

149.     Count XI is alleged against Defendant City of Chicago.

150.     Illinois law provides that public entities are directed to pay ant tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

151.     The CPD Defendants are or were employees of Defendant City of Chicago who acted within the scope of their employment in committing the misconduct described above.

152.     Defendants City of Chicago are thus liable under the theory of indemnification.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Wilmer Catalan-Ramirez requests that this Court enter judgment in his favor against Defendants in the following manner:

1.     Adjudge and declare that the policies, practices, and conduct described in this Complaint are in violation of the rights of Mr. Catalan-Ramirez under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

2.     Enjoin the Defendants from subjecting Mr. Catalan-Ramirez to the unlawful policies, practices, and conduct described in this Complaint.

3.      Retain jurisdiction of this case until such time as the Defendants have fully complied with all orders of the Court, and there is reasonable assurance that the Defendants will continue to comply in the future with these orders.

4.      Award Mr. Catalan-Ramirez compensatory and punitive damages.

5.      Award Mr. Catalan-Ramirez reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

6.      Award Mr. Catalan-Ramirez such other and further relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury on his damages claims.


Dated: September 6, 2017

                                        Respectfully submitted,

                                        **WILMER CATALAN-RAMIREZ**

                                        By: /s/ Sheila A. Bedi
                                            One of his attorneys

Sheila A. Bedi
Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-1271
sheila.bedi@law.northwestern.edu
vanessa.delvalle@law.northwestern.edu


"Julie" Yihong Mao
Sejal Zota
National Immigration Project of the National Lawyers Guild
14 Beacon Street, Suite 602

Boston, MA 02108
julie@nipnlg.org
sejal@nipnlg.org
(617) 227 - 9727
*applications for *pro hac vice* admission forthcoming


<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, certifies that she served the foregoing document upon all persons who have filed appearances in this case via the Court's CM/ECF system on September 6, 2017.

<u>/s/ Vanessa del Valle</u>